DR. BARBARA THOMPSON, State Superintendent, Department of PublicInstruction
Your predecessor requested my opinion on a number of questions pertaining to your duties in administering the National School Lunch Act. The first question is:
 1. Can the Department of Public Instruction, as the State Educational Agency defined in the National School Lunch Act, disburse federal funds apportioned to the Department of Public Instruction under such act to parochial schools operated or governed by parochial institutions for the maintenance, operation and expansion of nonprofit school lunch programs to be operated by the parochial school or on behalf thereof in the parochial school?
The National School Lunch Act (42 U.S.C. § 1751-63), appropriates funds to the Secretary of Agriculture for apportionment among the states to assist the states in the establishment, maintenance, operation and expansion of nonprofit school lunch *Page 474 
programs (42 U.S.C. § 1752-53). The Act places the basic responsibility for administration of the program on state educational agencies (42 U.S.C. § 1757).
The State Educational Agency selects schools for participation, makes agreements with participating schools, pays reimbursement claims from funds advanced to the states by the Secretary of Agriculture, and generally supervises operations in the local schools within the policies and regulations established by the Secretary of Agriculture (42 U.S.C. § 1757 and 7 CFR 210.14). The Act further provides that in the event the State Educational Agency is not permitted, by state law, to disburse the funds paid to it to private schools or to match federal funds made available for use by such private schools, the Secretary of Agriculture is authorized to administer the program in such schools (42 U.S.C. § 1759).
The applicable federal regulation, 7 CFR 210.14, requires that the state agency handling the federal funds must also provide program supervision as well as inspection and advisory services.
The second question asked is whether the required administration, supervision and inspection of parochial schools is permissible. I deem it appropriate to consider these two questions together since your agency apparently cannot disburse the monies without providing the required administration, supervision and inspection.
In order for your agency to disburse funds made available under the National School Lunch Act to parochial schools, it is necessary that you be authorized by state statute to both disburse the federal funds involved to nonpublic schools and to determine the eligibility of nonpublic schools to participate in the program. Administrative agencies have only such powers as are expressly granted by statute or necessarily implied as incidental to carrying out the duties and powers expressed in the statutes. Any power sought to be exercised must be found within the four corners of the statute under which the agency proceeds. State exrel. Farrell v. Schubert (1971), 52 Wis.2d 351, 190 N.W.2d 529,American Brass Co. v. State Board of Health (1944), 245 Wis. 440,15 N.W.2d 27.
The Department of Public Instruction is authorized by sec.115.34 (1), Stats., to contract with schools generally in order to distribute *Page 475 
federal monetary and food product aids to such schools. The section reads as follows:
 "(1) The department may contract for the operation and maintenance of school lunch programs and for the distribution, transportation, warehousing, processing and insuring of food products provided by the federal government. The form and specifications of such contracts shall be determined by the department. Amounts remaining unpaid for 60 days or more after they become payable under the terms of such contracts shall be deemed past due and shall be certified to the department of administration on October 1 of each year and included in the next apportionment of state special charges to local units of government as special charges against the school districts and municipalities charged therewith."
Such section provides that amounts unpaid for 60 days or more may through certification to the Department of Administration be placed "as special charges against the school districts and municipalities charged therewith." A persuasive argument can be made that the authority provided by sec. 115.34 (1), Stats., is limited to contracting with public schools. We need not consider whether the section is so limited since the Governor has, pursuant to sec. 16.54 (1) and (2), Stats., authority to accept federal funds and designate the agency to administer such funds. Such section reads in part as follows:
 "Acceptance of federal funds. (1) Whenever the United States government shall make available funds for the education, the promotion of health, . . . the governor on behalf of the state is authorized to accept the funds so made available. . . .
 "(2) Whenever funds shall be made available to this state through an act of congress and acceptance thereof as provided in sub. (1), the governor shall designate the state board, commission or department to administer any of such funds, and the board, commission or department so designated by the governor is authorized and directed to administer such fund for the purpose designated by the act of congress making an appropriation of such funds, or by the department of the United States government making such funds available to this state." *Page 476 
The state superintendent has been given specific legislative authority to receive and distribute federal funds under sec.115.28 (9), Stats., which reads:
"115.28 General duties. The state superintendent shall:
"***
 "(9) FEDERAL AIDS. Accept federal funds for any function over which the state superintendent has jurisdiction and act as the agent for the receipt and disbursement of such funds."
It is clear that the Superintendent has, if so designated by the Governor, the authority to administer funds received from the federal government under the rules and regulations prescribed in the National School Lunch Act in private schools.
Public funds can only be appropriated and used for a public purpose. State ex rel. Warren v. Reuter (1969), 44 Wis.2d 201,170 N.W.2d 790; State ex rel. Bowman v. Barczak (1967), 34 Wis.2d 57,148 N.W.2d 683; State ex rel. La Follette v. Reuter
(1967), 36 Wis.2d 96, 153 N.W.2d 49.
The stated purpose of the National School Lunch Act is set forth in 42 U.S.C. § 1751 as follows:
 "It is declared to be the policy of Congress, as a measure of national security, to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States, through grants-in-aid and other means, in providing an adequate supply of foods and other facilities for the establishment, maintenance, operation, and expansion of nonprofit school-lunch programs."
It is my opinion that state payment of the cost of supervision and administration of the program in private schools would be for a public purpose. So far as I am able to determine, no reported court decision, federal or state, has passed on this specific question in relation to the National School Lunch Act. However, in Cochran v. Louisiana State Board of Education (1930), 281 U.S. 370,50 S.Ct. 335, 74 L.Ed. 913, the Supreme Court dealt with a somewhat similar question. In this case it was held that an appropriation by the State of *Page 477 
Louisiana of money derived from taxation to the supplying of school books free for children in private as well as public schools was not objectionable under the Fourteenth Amendment to the United States Constitution as a taking of private property for public purposes where the books furnished for private schools were not granted to the schools themselves but only to or for the use of the children, and were the same as those furnished for public schools and were not religious or sectarian in character. This case was cited for the same proposition in Board ofEducation of Central School District No. 1, etc., et al. v. JamesE. Allen, as Commissioner of Education of New York, et al. (1968), 392 U.S. 236, 247, 88 S.Ct. 1923, 20 L.Ed.2d 1060, in these words:
 "Another corollary was Cochran v. Louisiana State Board of Education, 281 US 370, 74 L Ed 913, 50 S.Ct 335
(1930), where appellants said that a statute requiring school books to be furnished without charge to all students, whether they attended public or private schools, did not serve a `public purpose,' and so offended the Fourteenth Amendment. Speaking through Chief Justice Hughes, the Court summarized as follows its conclusion that Louisiana's interest in the secular education being provided by private schools made provision of textbooks to students in those schools a properly public concern: `[The State's] interest is education, broadly; its method, comprehensive. Individual interests are aided only as the common interest is safeguarded.' 281 US, at 375, 74 L Ed at 915."
The reasoning of the Cochran and Board v. Allen cases is, I believe, applicable to the situation here under consideration, for if providing children in private or parochial schools with school books of a nonsectarian character is imbued with a public purpose then there is in my judgment a legitimate public purpose in providing the services of state employes to supervise school lunch programs. The supervisory services here in question, like school books, are nonsectarian in character. They would be, if carried out in private or parochial schools in this state, of no different character than the supervisory services now rendered by you in the public schools in connection with the school lunch program. The similarities, then, between the appropriations for purchase of school books in the Cochran and Board v. Allen cases and the expenditure of state monies for the supervisory services here in question lead me to the *Page 478 
conclusion that to finance such activity would be as clearly an expenditure of this state for a public purpose as was the expenditure, challenged in the Cochran and Board v. Allen cases. Such legitimate public purpose is not changed because a private school is used as a means to attain the end of promoting the health and welfare of children. State ex rel. Warren v. Reuter,supra, p. 214.
Most of the nonpublic schools in Wisconsin are parochial schools. The stipulation of facts in State ex rel. Reynolds v.Nusbaum (1962), 17 Wis.2d 148, 151, 115 N.W.2d 761, was to effect there were 850 to 875 nonpublic schools in Wisconsin of which only 10 were not operated by any religious, church, or sectarian organization. The funds received by a parochial school to aid in payment of the cost of its school lunch program would constitute "money drawn from the treasury" regardless of whether the origin of the funds was the federal government. Federal funds received under provisions of the National School Lunch Act must be paid into the general fund and are then subject to the limitations of Art. I, sec. 18, Wis. Const. See secs. 20.865 (4) (m) and 20.906 (1), Stats. The proper disposition of federal funds is comprehensively discussed in 55 OAG 124, an opinion related to the state's participation in the education program established by the Federal Elementary and Secondary Education Act of 1965.
The memorandum enclosed with the opinion request letter outlines certain of your supervisory duties in the following words:
 ". . . This supervision consists partly in an administrative review of the operations of the program in each school. The review consists of a personal visit to the school to observe the operation of the program and to determine whether the operations are in compliance with the requirements of the National School Lunch Act and the regulations issued by the Secretary of Agriculture. The review includes, also, a determination as to whether state and local laws, rules, and regulations concerning sanitation in the storage, handling, and preparation and serving of food are being carried out and whether the equipment which has been furnished by the school or school district is adequate and proper for the number of lunches being produced. The reviewer is required to make an examination into the recordkeeping of the school or school *Page 479 
district and to advise and consult with the responsible officials of the school district. . . .
 ". . . Where the reviewer's report shows that there is a serious failure to observe the pertinent laws, rules, regulations and ordinances in the operation of the program, the State Agency has the authority to suspend reimbursement payments until corrective measures have been taken or to proceed with the cancellation of the agreement, according to the seriousness of the situation."
The applicable federal regulation, 7 CFR 210.14, requires that in addition to program supervision, each state agency must provide adequate personnel for instructional and advisory services. The question therefore arises as to whether the channeling of such federal aid funds through the state treasury and the providing of the required supervisory and advisory services violates theFirst Amendment to the United States Constitution, or Art. I, sec. 18
of the Wisconsin Constitution.
The Wisconsin Supreme Court has indicated in State ex rel.Warren v. Nusbaum (1972), 55 Wis.2d 316, 332, 198 N.W.2d 650, and State ex rel. Warren v. Nusbaum (1974), 64 Wis.2d 314,219 N.W.2d 577, that Art. I, sec. 18, Wis. Const., and theFirst Amendment of the United States Constitution, ". . . operate to serve the same dual purpose of prohibiting the `establishment' of religion and protecting the `free exercise' of religion."
Article I, sec. 18, Wis. Const., reads as follows:
 "SECTION 18. The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." (Emphasis added.)
The above emphasized portion of Art. I, sec. 18, Wis. Const., has been interpreted by the court in both Nusbaum cases as *Page 480 
encompassing the "primary effect test" defined in Tilton v.Richardson (1971), 403 U.S. 672, 679, 91 S.Ct. 2091,29 L.Ed.2d 790, rehearing denied in 404 U.S. 874, in these words:
 "The crucial question is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion."
Additionally, the following definitive language also appears inNusbaum at 55 Wis.2d 333:
 ". . . `For the benefit of' is not to be read as requiring that some shadow of incidental benefit to a church-related institution brings a state grant or contract to purchase within the prohibition of the section. . . ."
The United States Supreme Court in Committee For PublicEducation and Religious Liberty v. Nyquist (1973), 413 U.S. 756,773, 93 S.Ct. 2955, 37 L.Ed.2d 948, provided the following three-part test to be utilized in answering questions of aid to parochial schools:
 ". . . [T]o pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, . . . second, must have a primary effect that neither advances nor inhibits religion, . . . and, third, must avoid excessive government entanglement with religion, . . ." (Citations omitted.)
 A. Does the National School Lunch Act reflect a clearly secular legislative purpose?
It is my opinion that the National School Lunch Act is in furtherance of a purely secular legislative purpose. Congress has in 42 U.S.C. sec. 1751, declared the purpose of the act in part to ". . . safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other foods, . . ." Such legislative declaration of policy should be given great weight. State ex rel.Warren, et al. v. Nusbaum (1974), supra. Analysis of the entire Act does not indicate a purpose other than the secular purposes stated in the preamble quoted in part above. However, as indicated in Nusbaum (1974), at *Page 481 
p. 323, a finding of proper secular legislative purpose does not immunize the Act from further constitutional challenge on the basis of possible "primary effect which advances religion" or "excessive entanglement."
B. Does the "primary effect" of the Act advance religion?
As previously discussed, the express purpose of the Act is secular, leaving the "primary effect" test to determine whether the furtherance of such secular purpose principally benefits a parochial school, or principally benefits children with only incidental and constitutionally permissive benefits accruing to the school. The answer to the "primary effect" test question can best be sought by noting various types of plans involving aid to private elementary and secondary schools decided and held to be permissible under this test by the United States and Wisconsin Supreme Courts.
In Everson v. Board of Education (1946), 330 U.S. 1,67 S.Ct. 504, 91 L.Ed. 711, the United States Supreme Court upheld the constitutionality of a legislative enactment providing state funding for the bussing of all children, including those attending parochial schools. Although the formal "primary effect" test was to develop in later cases, the court said that the legislation involved, ". . . does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." 330 U.S. 18. The court upheld the legislation even after noting that some benefit would accrue to the parochial schools.
In Board of Education v. Allen, supra, a New York statute requiring local public school authorities to lend secular textbooks to parochial schools was before the court. Applying the "primary effect" test the court held the statute constitutional saying:
 "The law merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, . . . Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in Everson *Page 482 
and does not alone demonstrate an unconstitutional degree of support for a religious institution." 392 U.S. 243, 244.
The Everson and Allen cases set forth precedents concerning the "primary effect" test that in my opinion would compel the finding of constitutionality of the National School Lunch Act by the United States Supreme Court. The recent opinion of State ex rel.Warren v. Nusbaum, supra, indicates a similar result would probably obtain before the Wisconsin Supreme Court.
In Nusbaum (1974), the Wisconsin Court considered, on declaratory judgment, the constitutionality of ch. 89 of the Laws of 1973, a comprehensive act providing educational opportunities for handicapped children. The Act provides that in certain circumstances the state can contract for special educational programs in private institutions, including sectarian institutions. It was this facet of the Act dealt with by the court. The court stated at p. 324:
 "Initially it must be recognized that the mere contracting for goods or services for a public purpose with a sectarian institution is appropriate state action. It is only when such a contract has a primary effect of advancing religion that the constitutional prohibitions come into effect."
Thereafter, in applying the "primary effect test" the court concluded at p. 328:
 "The primary effect of ch. 89, Laws of 1973, is not the advancement of a religious organization but the providing of special educational services to the handicapped children of Wisconsin, a secular purpose. Some incidental benefit may accrue to a religious organization, as Mr. Justice ROBERT W. HANSEN commented in Nusbaum:
 "`"For the benefit of" is not to be read as requiring that some shadow of incidental benefit to a church-related institution brings a state grant or contract to purchase within the prohibition of the section.' Id. at p. 333."
***
 "We conclude that sec. 115.85 (2) (d), Stats., of the Laws of 1973 does not violate the religious clauses of the *Page 483 first amendment of the United States or art. I, sec. 18 of the Wisconsin Constitutions."
It appears that the potential for prohibited benefit to a parochial school under provisions of the National School Lunch Act is somewhat less in degree than that present in aids to institutions under ch. 89, Laws of 1973. In either situation, the primary or principal beneficiaries are the children. It is my opinion that the "primary effect" of the National School Lunch Act is not the advancement of religion.
 C. Does state implementation and administration of the Act in parochial schools require excessive governmental entanglements with religion?
The method of implementing the "excessive entanglements" test was set forth in Lemon v. Kurtzman (1971), 403 U.S. 602, 615,91 S.Ct. 2105, 29 L.Ed.2d 745, in these words:
 "In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority. . . ."
Institutions benefited under the Act are the food service programs in all schools. This is quite unlike the situation inLemon, in which the characteristics of parochial teachers and educational philosophy as an institution was compared to that in public schools. The character and purpose of the National School Lunch Act is not sectarian in nature. Aid provided by the Act is to food service programs in schools and it is therefore difficult to imagine any significant difference in character between the program in public and sectarian schools. Thus, it is my opinion that the character of the lunch program is not such that "excessive entanglement" would be present.
The court in Lemon stated further as follows at 403 U.S. 616-617:
 "The dangers and corresponding entanglements are enhanced by the particular form of aid that the Rhode Island Act provides. Our decisions from Everson to Allen have *Page 484 
permitted the States to provide church-related schools with secular, neutral, or nonideological services, facilities, or materials. Bus transportation, school lunches, public health services, and secular textbooks supplied in common to all students were not thought to offend the Establishment Clause. . . ." (Emphasis added.)
Support for the conclusion that the National School Lunch Act does not involve "excessive entanglements with religion," can be found in the Wisconsin Court's handling of this test in Nusbaum
(1974), supra. The Wisconsin Court stressed therein that the nature of the aid, special education for the handicapped, being nonsectarian, rendered governmental involvement with the institution minimal and not constitutionally objectionable. Similarly, the nature of the aid involved here, school lunch program assistance, would probably render unobjectionable the contacts your office would necessarily have to make with parochial schools in administering the Act for those parochial schools.
I therefore conclude, notwithstanding the ever present possibility that a constitutional infirmity could arise in implementation of the Act, that neither the United States nor Wisconsin Constitutions prohibit your agency from administering the National School Lunch Act in parochial schools.
The third question asks:
 3. Can the Department of Public Instruction, as the State Educational Agency, disburse funds, pursuant to new subsection 13 (a) (1) of the School Lunch, apportioned to it by the National School Lunch Act, to initiate, maintain or expand nonprofit, nonsectarian food service for children in private nonprofit institutions such as child day-care centers, settlement houses, recreation centers which provide day care or other child care where children are not maintained at residence?
Section 13 as set forth in P.L. 90-302; 82 Stats. 117 amends the National School Lunch Act to provide aids for lunch programs in "service institutions" which provide day care and other nonresidential child care such as child day-care centers, settlement houses and recreation centers. This section (42 U.S.C. § 1761) is *Page 485 
entitled "Special Food Service Program for Children." The term "service institutions" is defined in 42 U.S.C. § 1761 (a) (1) and (2) as:
 "(a) (1) . . . For purposes of this section, the term `service institutions' means private, nonprofit institutions or public institutions, such as child day-care centers, settlement houses, or recreation centers, which provide day care, or other child care where children are not maintained in residence, for children from areas in which poor economic conditions exist and from areas in which there are high concentrations of working mothers, and includes public and private nonprofit institutions providing day care services for handicapped children.
 "(2) Subject to all the provisions of this section, the term `service institutions' also includes public or private nonprofit institutions that develop special summer programs providing food service similar to that available to children under the National School Lunch or School Breakfast Programs during the school year, including such institutions providing day care services for handicapped children."
Section 1761 (c) (1) provides that the State Educational Agency is to disburse the funds in these words:
 "(c) (1) Funds paid to any State under this section shall be disbursed by the State educational agency to service institutions, selected on a non-discriminatory basis by the State educational agency, . . ."
It is necessary to consider, in determining whether the Department of Public Instruction may disburse funds allotted under the Special Food Service Program for Children, first, whether such State Educational Agency is authorized by state statute to implement such program and second, whether the expenditure of state money in implementing the program is for a public purpose. Section 115.34, Stats., authorizing the Department to "contract for the operation and maintenance of school lunch programs" is limited to schools. The word "school" is a generic term which denotes an institution for instruction or education. State ex rel. Dick v. Kalaher (1911), 145 Wis. 243,247, 129 N.W. 1060. Moreover, ch. 115 of the statutes is concerned solely with public schools and special state schools for the *Page 486 
handicapped. The authority given to the State Superintendent to operate the school lunch programs does not extend to day-care centers, settlement houses and recreation centers as specified in the Special Food Service Program for Children. However, as previously stated in this opinion, the Governor has authority, under sec. 16.54 (1) and (2), Stats., to accept federal funds and designate the agency to administer such funds. The State Superintendent, if so designated by the Governor, has specific authority to receive and distribute such funds under sec. 115.28
(9), Stats.
The purpose of the Program is to satisfy the nutritional needs of preschool children and school children during the summer months by providing food assistance programs to day-care and other child-care institutions for children from areas in which poor economic conditions exist and from areas in which there are high concentrations of working mothers. See 1968 U.S. Code Cong. and Admin. News, 1932. A private organization may be used by the state to promote a public purpose. Warren v. Reuter, supra, p. 213. With the stated purpose of the bill in mind, it appears that the expenditure of state monies to implement the Special Food Service for Children is for a public purpose. It is therefore my opinion that you may disburse funds pursuant to 42 U.S.C. § 1761 of the National School Lunch Act if the Governor has designated your agency to administer such funds under sec. 16.54 (1) and (2), Stats.
The fourth question is:
 4. Can the Department of Public Instruction disburse federal funds apportioned to it by the National School Lunch Act to a parochial institution operating programs described in Question 3 above?
Funds paid to a state under the Special Food Service Program for Children are used to reimburse the institution for the cost of obtaining and preparing foods and as grants of aid to institutions to pay for the cost of equipment used in preparation and serving of foods (42 U.S.C. § 1761). The secular purpose of this program is set forth in 1968 U.S. Code Cong. and Admin. News, pp. 1932-33, which reads, in part:
 "The National School Lunch Act presently provides Federal assistance to the States to carry on school lunch programs at *Page 487 
reduced costs to recipients. Because that act is limited to programs carried on by schools, a great nutritional need exists among preschool children, and also among school-age children during the summer months. This bill proposes to meet this need by providing food assistance programs to day-care and other child-care institutions for children from areas in which poor economic conditions exist and from areas in which there are high concentrations of working mothers. Other public and private nonprofit institutions which provide day-care services for handicapped children are also included. These institutions, including day-care centers, settlement houses, nonresidential summer camps and playgrounds, will be aided in their food programs.
"***
 "The bill closely parallels the National School Lunch Act to which it is intended to serve as a complement. Meals may be served to children participating in programs operated by these service institutions. Experience has proven that the inadequate diets received by too many youths handicap them throughout their lives. Many medical problems have their origins in deficient nutrition and poor eating habits acquired during childhood. Faulty nutrition cannot only result in physical disabilities, but also in mental disorders and retardation. Lack of ambition and motivation can often be traced to vitamin and mineral deficiencies."
I am of the opinion, based upon the reasoning set forth above in relation to the implementation of the National School Lunch Act in parochial schools, that your department may distribute funds under the Special Food Service Plan for Children without violating the aforediscussed constitutional provisions relating to aid to parochial organizations.
The final question is:
 5. Could the Department of Public Instruction visit the programs described in Questions 3 and 4 above in the manner and for the purposes set out in Question 2?
Section 16.54 (2), Stats., provides: *Page 488 
 "Whenever funds shall be made available to this state through an act of congress and acceptance thereof as provided in sub. (1), the governor shall designate the state board, commission or department to administer any of such funds, and the board, commission or department so designated by the governor is authorized and directed to administer such fund for the purpose designated by the act of congress making an appropriation of such funds, or by the department of the United States government making such funds available to this state."
Subsection 42 U.S.C. § 1761 (h) (5) of the Special Food Service Program for Children requires that the "State educational agencies" shall keep such records as the Secretary of Health, Education and Welfare shall require as necessary under the program. You are, if authority is given by the Governor, empowered by sec. 16.54 (2), Stats., to do whatever is necessary to administer the program within the previously discussed confines of the United States and Wisconsin Constitutions.
RWW:WMS