DR. HERBERT J. GROVER, State Superintendent Department ofPublic Instruction
You have asked three questions:
 1. May a school district permit a private school pupil or a child in a home-based private educational program to participate in selected courses or activities of the public school district?
 2. What obligation does a public school district have to grant such permission? You also specifically inquire as to whether the answer to this question depends upon any of the following factors:
 a. Whether the primary purpose of the program is to provide private or religious based education;
 b. Whether the selected public school courses would be included in the criteria in sec. 118.165 (1)(d), Stats.; or
 c. Whether the public school district would incur additional costs in permitting the pupil to participate in the selected courses or activities?
 3. May a Wisconsin public school district lease the use of a religious school facility where no religious activities are conducted during the daily periods of public school use, where religious symbols and artifacts are removed during the daily periods of public school use, where the public school use consists of public school teachers instructing public school students, and where a reasonable rental is paid for the use?
The answer to your first question is yes, but with certain limitations as set forth in the discussion below. The answer to your second question is that the obligation of a school district is to provide an "equal opportunity for education to all children in the district." Once the statutory opportunities required by the state are offered, the local district may provide additional programs to all *Page 252 
children in the district provided that such programs are within the parameters of the first amendment religion clause of the United States Constitution and article I, section 18 of the Wisconsin Constitution. The three factors you delineate with respect to your second question are important factors in determining the legality of providing for the participation of private or home-based pupils. In response to the third question, I conclude that such an arrangement would not violate the state or federal constitution and would be legal so long as statutory procedures for leasing school sites are followed.
I.
 PARTICIPATION OF A PRIVATE SCHOOL PUPIL IN COURSES AND ACTIVITIES OF A PUBLIC SCHOOL DISTRICT
The propriety of the arrangements described in your questions depends upon the application of certain state and federal constitutional provisions. Because in Wisconsin the majority of private schools are religious schools,[1] the relevant constitutional provisions are the first amendment to the United States Constitution, and article I, section 18 and article X, section 3 of the Wisconsin Constitution.
A. The United States Constitution
The first amendment to the United States Constitution provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." This provision applies to the states through thefourteenth amendment. See Cantwell v. State of Connecticut, 310 U.S. 296
(1940).
In determining the constitutionality of a statute under the establishment clause of the first amendment, three criteria must be applied: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . finally, the statute must not foster `an excessive government entanglement with religion' [citations omitted]." Lemon v. Kurtzman, 403 U.S. 602,612 (1971). The Wisconsin *Page 253 
Supreme Court has adopted this three-part test. State exrel. Warren v. Nusbaum, 64 Wis.2d 314, 219 N.W.2d 577 (1974).
1. Purpose
The arrangement you describe of permitting private school or private home-program pupils to participate in selected courses or activities of the public school district would not appear to violate the first criterion of the three-part test set forth above. Allowing such participation would have the permissible secular purpose of advancing the education of all the children in the state. "The State has a substantial and legitimate interest in insuring that its youth receive an adequate secular education." Levitt v. Committee for Public Education ReligiousLib., 413 U.S. 472, 479-80 n. 7 (1973). The difficulties lie with the benefits which such arrangements confer on religious institutions and the potential for entanglement of church and state.
2. Effect
The United States Supreme Court has recently had occasion to look at the question of what limits exist on government's power to provide educational services to sectarian schools. These cases focused on whether the arrangements at issue had a principal or primary effect of advancing religion and whether they fostered "excessive entanglement" between church and state.
In Grand Rapids School Dist. v. Ball, 105 S.Ct. 3216 (1985), which involved the provision of classes to nonpublic pupils at public expense in classrooms located in and leased from sectarian schools, the Court focuses on the "primary effects" test. These programs were invalidated by the Court because they impermissibly advanced the sectarian religious mission of the parochial schools, although they did have the permissible secular purpose of providing education. The Court found three ways in which the programs advanced religion: First, "state-paid instructors, influenced by the pervasively sectarian nature of the religious schools in which they work, may subtly or overtly indoctrinate the students in particular religious tenets at public expense." Second, "state-provided instruction in the religious school buildings threatens to convey a message of state support for religion to students and to the general public." Third, "the programs in effect subsidize the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects." Grand Rapids, *Page 254 105 S. Ct. at 3230. Three subfactors are thus identified within the "effects" test: indoctrination, symbolism and subsidization.
A state law may have a legitimate "primary effect" of the provision of secular education to all students, but still be unconstitutional because it has an additional "primary effect" of advancing religion. Nyquist, 413 U.S. at 783-84 n. 39. The United States Supreme Court has distinguished between those cases in which state aid has only an indirect or incidental benefit upon religious institutions and those that provide direct and substantial support which advances a sectarian enterprise. Indirect and incidental benefits to church-related schools do not violate the constitutional prohibition against the establishment of religion. Meek v. Pittenger, 421 U.S. 349, 365 (1975). In accord, see Everson v. Board of Education of Ewing Tp., 330 U.S. 1
(1947), (Reimbursement of bus fare to parochial schools is indirect aid only and, therefore, does not violate the constitution). But see Committee for Public Ed. Religious Lib.v. Nyquist, 413 U.S. 756, 783 n. 39 (1973) (striking down a New York statute providing for payment out of public funds for maintenance and repair for private schools, tuition reimbursement to private school pupils and income tax benefits to parents of children attending private school), and Sloan v. Lemon, 413 U.S. 825
(1973) (holding that a Pennsylvania statute providing for reimbursement of tuition paid by parents who send their children to nonpublic schools had the impermissible effect of advancing religion and was, therefore, unconstitutional under the establishment clause).
In Wolman v. Walter, 433 U.S. 229 (1977), the Court upheld the constitutionality of an Ohio program whereby state funds were expended to provide therapeutic guidance and remedial services for nonpublic students in public schools or mobile units located off the nonpublic school premises. The Court explained why these types of programs were not in the nature of aid having a primary effect of advancing religious institutions:
 The reason for considering diagnostic services to be different from teaching or counseling is readily apparent. First, diagnostic services, unlike teaching or counseling, have little or no educational content and are not closely associated with the educational mission of the nonpublic school. Accordingly, any pressure on the public diagnostician to allow the intrusion of sectarian views is greatly reduced. Second, the diagnostician has only limited contact with the child, and that contact involves *Page 255 
chiefly the use of objective and professional testing methods to detect students in need of treatment. The nature of the relationship between the diagnostician and the pupil does not provide the same opportunity for the transmission of sectarian views as attends the relationship between teacher and student or that between counselor and student.
Wolman, 433 U.S. at 244. In addition, the Court emphasized that these services were offered under circumstances which reflected neutrality, i.e., off the premises of private schools. Also seeNyquist, 413 U.S. at 783 n. 39, and Meek, 421 U.S. at 371 n. 21.
Similarly, neither of the subfactors expressed in Grand Rapids
of indoctrination or symbolism would appear to be present where private school students are allowed to attend limited classes within public schools, so long as those classes are not of a religious nature.
In Grand Rapids, the Court was notably concerned with the possibility that public schools could gradually take on the entire responsibility for teaching secular subjects to religious school pupils, thereby providing a substantial subsidy to the nonpublic school. Private schools in Wisconsin are required by statute to teach certain basic secular courses. See sec. 118.165
(1)(d), Stats. Instruction in these subjects is essential to the existence of these schools and their recognition by the state. If the state directly assumes part of the parochial schools' education requirements, this inevitably provides a substantial subsidy to a religious institution. The more courses the public school district allows the private school pupil to attend, the more subsidization is occurring. Direct aid in meeting this necessary function is prohibited just as provision of instructional material is prohibited.
 The very purpose of many [religious] schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See Lemon v. Kurtzman, 403 U.S., at 616-617, 91 S.Ct. [2105], at 2113. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. `[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.'
Meek, 421 U.S. at 366. *Page 256 
3. Entanglement
In the second case, Aquilar v. Felton, 105 S.Ct. 3232 (1985), the Court held that a program in which New York City used Title I funds to pay salaries of public school employes to teach in parochial schools violated the establishment clause. The Court reasoned that even if this aid did not have the primary effect of advancing religion, the fact that the program provided for a system of monitoring the content of publicly funded classes necessarily resulted in an excessive entanglement of church and state. The Court's discussion of the entanglement test analyzed both the sectarian environment itself and the conduct of state personnel inside the sectarian school.
 The administrative cooperation that is required to maintain the educational program at issue here entangles Church and State in still another way that infringes interests at the heart of the Establishment Clause. Administrative personnel of the public and parochial school systems must work together in resolving matters related to schedules, classroom assignments, problems that arise in the implementation of the program, requests for additional services, and the dissemination of information regarding the program. Furthermore, the program necessitates "frequent contacts between the regular and the remedial teachers (or other professionals), in which each side reports on individual student needs, problems encountered, and results achieved."
Aquilar, 105 S.Ct. at 3239.
Entanglement can flow from the need for frequent administrative supervision or from the potential for religious-political strife such involvement may generate. For example, in Meek, the teaching of special education courses in parochial schools by public school teachers was held to violate the first amendment to the United States Constitution because the Court concluded it was administratively impossible to keep the publicly provided program neutral and nonsectarian, and to politically maintain the program without dividing the community along religious lines.
Allowing private school pupils to attend classes in public schools, if the courses are not included within the criteria found in section 118.165 (1)(d), would not violate thefirst amendment to the United States Constitution. The primary purpose of the program would not be to provide religious based education but to advance *Page 257 
the education of all children of the state. There would be little risk of subtle indoctrination in religious tenets by teachers, or the possible symbolic message of support conveyed by providing instruction on the premises of a sectarian institution. In addition, there would be no reason for frequent contact between administrative personnel of the public and private school systems involved, nor should the community have reason to oppose such arrangements. Finally, the state would not be subsidizing sectarian schools by providing the basic secular courses private schools are required to teach.
B. The Wisconsin Constitution
Article 1, section 18 of the Wisconsin Constitution reads as follows:
 The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.[2]
Article 1, section 18 is the freedom of worship section of the Wisconsin Constitution. The provisions of both thefirst amendment and article I, section 18 of the Wisconsin Constitution "`are intended and operate to serve the same dual purpose of prohibiting the "establishment" of religion and protecting the "free exercise" of religion. . . .'" State ex rel. Holt v.Thompson, 66 Wis.2d 659, 676, 225 N.W.2d 678 (1975), quotingState ex rel. Warren v. Nusbaum, 55 Wis.2d 316, 322,198 N.W.2d 650 (1972). The test for an establishment clause violation is basically the same under both constitutions. American MotorsCorp. v. ILHR Dept., 93 Wis.2d 14, 29-30, 286 N.W.2d 847 (Ct. App. 1979). However, the language of article 1, section 18 of the Wisconsin Constitution is more specific than that found in the establishment and free exercise clauses in the first amendment. It contains the additional language: "[N]or *Page 258 
shall any money be drawn from the treasury for the benefit of
religious societies . . . ." The added "for the benefit of" language in the state constitution may require additional analysis. See 64 Op. Att'y Gen. 75, 78 (1975), and cases cited therein. However, the Wisconsin Supreme Court has explained:
 This language has been construed by this court as encompassing the "primary effect test" such that:
 "`The crucial question . . . not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion.'" State ex rel. Warren v. Nusbaum, supra, at page 333, quoting Tilton v. Richardson, supra, at page 679.
State ex rel. Warren v. Nusbaum, 64 Wis.2d 314, 328,219 N.W.2d 577 (1974)
A number of attorney general opinions have addressed the scope of article I, section 18 of the Wisconsin Constitution. See 55 Op. Att'y Gen. 124 (1966) (article I, section 18 of the Wisconsin Constitution prohibits the use of funds received under Title I of the Elementary and Secondary Education Act to pay salaries of any persons teaching in church-affiliated schools, whether or not they were public school teachers sent to such schools); 64 Op. Att'y Gen. 136 (1975). (To confer Title I benefits on a parochial school would violate article I, section 18 of the Wisconsin Constitution, which provides, in part: "[N]or shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."); 64 Op. Att'y Gen. 75 (1975) (a school district can provide health and welfare services to students attending private schools, but not educational services).
In 64 Op. Att'y Gen. 139 (1975), however, I concluded that funds under section 406 of Title IV of the Elementary and Secondary Education Act may be spent on "dual enrollment" or "shared time" programs, where both public and private students are permitted to participate, as long as the services are provided on public school premises.
 Implicit in any dual enrollment program is the requirement that both public and private school students be permitted to participate in the same program. Subject to this condition and the condition that the services be rendered on the premises of a public school, it is permissible for a public school district to *Page 259 
spend money to provide instructional programs and services to private school children and teachers.
64 Op. Att'y Gen. at 142.
Based upon case law which has developed since that opinion, it should be noted that the provision of such programs and services to private school children are permitted only so long as those services are in the nature of remedial programs, such as the instruction mandated by federal laws for those school districts receiving federal funds, or supplemental courses, and not those courses mandated by section 118.165 (1)(d).
To the extent that the courses or activities which you propose to allow private school pupils to participate in are in the nature of therapeutic, guidance or remedial programs, or supplemental instruction, I conclude that such an arrangement would not violate federal or state constitutional prohibitions.See Wolman, Meek and Nusbaum. However, if the selected courses are those which provide basic education in the areas mandated by section 118.165 (1)(d), i.e., reading, writing, mathematics, social studies and science, I believe an arrangement permitting the attendance of private school pupils in publicly provided courses would unconstitutionally have the primary effect of advancing religion. In order to exist, private schools are required to provide these course subjects. If the state provides instruction in such areas for sectarian schools, this necessarily reduces their education costs and frees their resources for religious purposes. Such a result is not permitted by either the state or federal constitutions.
II.
 OBLIGATION OF SCHOOL DISTRICTS
Article X, section 3 of the Wisconsin Constitution gives all children between the ages of four and twenty years the right to a free public education.
Article X, section 3 provides:
 District schools; tuition; sectarian instruction; released time. SECTION 3. [As amended April 1972] The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be *Page 260 
allowed therein; but the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours. [1969 J.R. 37, 1971 J.R. 28, vote April 1972]
In analyzing this section, the court in Buse v. Smith,74 Wis.2d 550, 567, 247 N.W.2d 141 (1976), stated:
 The involvement of the legislature from the framing of the constitution to the present and the many cases which have come before this court, emphasize that the equal opportunity for education as defined by art. X, sec. 3, is a fundamental right.
 To hold that the right to equal opportunity for education is a fundamental right under the Wisconsin Constitution and to hold that the legislature is constitutionally mandated to provide an equal opportunity for education as that term is defined by the criteria set forth in sec. 3, art. X, is not necessarily to validate as constitutional any means chosen by the legislature to achieve that end.
(Emphasis added.) The analysis in the emphasized language can be applied to local public school districts, and forms the basis for a discussion of the powers and duties of the local school districts.
This provision does not indicate whether this right is only available to those students who attend public school full-time. Because section 118.155 gives public school students the right to be released from school to obtain religious instruction during school hours, it could be argued that the right to attend public school is not conditioned on full-time attendance. If this is true, then the right to attend public school part-time should not be denied to parochial school students. The comparison, however, is fatally flawed by the distinction that the parochial school pupil has chosen to receive his or her basic education in a sectarian school. A parochial school cannot take a student's tuition and then send that student off to public school for instruction in the basic courses which it is itself obligated to provide in order to fall within the statutory definition of a "private school."
To the extent the nature of courses being provided are those previously discussed as being permissible under the constitution, section 120.12, which gives a school district the power of general supervision and management over buildings, implies the authority to allow parochial pupils to attend public school part-time. 53 Op. *Page 261 
Att'y Gen. 187 (1964). This opinion, however, did not address the issue of whether a district is obligated to provide such services.
In response to the question of whether the state can provide for participation by private school children in Title IV programs if a local district refuses, or is legally unable to provide for their participation on an equitable basis, I stated:
 Wisconsin has a firmly established policy of local control over elementary and secondary education. This policy is expressed throughout the statutes relating to education. For example, sec. 120.12 (1), Stats., vests in the local school board the care, control and management of school district property and affairs. And sec. 120.49 (1), Stats., authorizes school boards to establish and organize schools and prescribe courses of study. The proposal set forth in your sixth question to allow the state educational agency to provide for participation of private school children in Title IV programs in the event a local school district refuses to provide such programs is inconsistent with the policy of local control over education.
 In addition, the Department of Public Instruction is without statutory authority to provide for participation of private school children in the place of a local school district which refuses or is legally unable to do so. For these same reasons your department may not supplant a local school district in the administration of Title IV programs.
64 OP. Att'y Gen. at 142-43. Therefore, I conclude the department could not obligate a district to provide access to courses to private school pupils.
School districts which receive federal funds under 20 U.S.C. § 2701
(1982) et seq., the Elementary and Secondary Education Act of 1965, as amended, are required to make arrangements for participation in funded special educational programs by children of the district enrolled in private schools to the extent local educational agencies are not prohibited by law from providing such participation. 20 U.S.C. § 2740 (1982). The receipt of such funds would thus present a circumstance under which school districts would be obligated to provide access to courses or activities to private school pupils. These funds, however, are only to be used for supplemental instructional services and cannot supplant instruction in regular classes. See Bennett v.Kentucky Dept. of Educ., 105 S.Ct. 1544 *Page 262 
(1985). If the public school district incurs additional costs in permitting the pupil to participate in the selected courses or activities, such an arrangement again would be unconstitutional unless those costs are covered by federal funding which mandates provision of supplemental services to private pupils.
III.
 LEASING SPACE FROM A SECTARIAN SCHOOL
Your third question asks whether a public school district could lease space in a religious school facility for the teaching of public school students by public school teachers. A public school district may lease the use of a religious school facility if no religious activities are conducted during the periods of public school use, if all religious symbols and artifacts are removed, if a reasonable rental is paid and if the use by the public school district involves public school teachers instructing public school students only. In addition, the district must comply with relevant statutory procedures. Wisconsin statutes authorize a public school district to lease "suitable buildings" for a period not exceeding twenty years with annual rentals fixed by the lease. Sec. 120.10 (5), Stats.
Although the first amendment provides for separation of church and state, it does not prohibit reasonable cooperation between governmental entities and religious organizations.
 The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other — hostile, suspicious, and even unfriendly.
Zorach v. Clauson, 343 U.S. 306, 312 (1952).
The rental of space in order to provide classrooms for public school students clearly fulfills a secular purpose. The classrooms leased would not be used to conduct classes for private school pupils, nor will public school teachers be teaching private school pupils. Thus, this arrangement is distinguishable from the leasing of classrooms in parochial schools by public school districts in order to provide educational programs under Title I of Elementary and Secondary Education Act to parochial school students, which I *Page 263 
previously advised your predecessor was prohibited by the establishment clause of the United States Constitution and article I, section 18 of the Wisconsin Constitution. 67 Op. Att'y Gen. 283 (1978). Even though the space would be under the control of the public school administration due to the lease, the arrangement was objectionable because of the benefit it would confer on parochial schools.
Neither does this arrangement appear to violate the "primary effect" or "excessive entanglement" tests. Although it is true that a religious institution may be receiving monies from the state as a result of this lease, these benefits are in the nature of indirect and incidental aid and are, therefore, not necessarily prohibited by the constitution. Meek,421 U.S. at 359.
In State ex rel. Sch. Dist. v. Nebraska State Bd. of Ed.,188 Neb. 1, 3, 195 N.W.2d 161, cert. denied, 409 U.S. 921 (1972), the Court upheld the "right of a public school district to use or lease all or a part of a church or other sectarian building for public school purposes . . . ." In its opinion denying certiorari, the United States Supreme Court explained why there appeared to be nothing unlawful in the rental of space: "There is not the slightest suggestion that this was a subterfuge to make a subsidy to the parochial school, or anything except an arrangement motivated solely by the lack of space in the public schools." 409 U.S. at 925.
The isolation of the rooms leased and the precautions your question contemplates sufficiently insulate the public school students using such facilities from the religious influence of the sectarian institution. Any contacts the public school pupils would have with religious influences would be indirect and inconsequential.
The renting of space by a public school district in a private school would create a landlord-tenant relationship with public school officials having administrative control of the space rented. The fact of negotiating a lease, arranging for space and ensuring the restriction of contacts would, of course, result in some entanglement. However, it would not be so extensive as to be "excessive." In the lease situation presented by your question those contacts would likely include a small number of meetings initially to discuss such non-ideological matters as allocation of space and scheduling.
Another aspect of the entanglement question is the potential for political divisiveness. This would not appear to be a concern here *Page 264 
where the lease arrangement is merely an expedient to provide temporary needed space to public school pupils. This situation is distinguishable from Lemke v. Black, 376 F. Supp. 87 (E.D. Wis. 1974), in which the court held the use of a church for a public school graduation ceremony unconstitutional on entanglement grounds. The specific facts of that case disclosed there had been active opposition to the holding of the ceremony in the church, and the decision to go ahead had resulted in increased religious tension and political divisiveness. The court did recognize that use of a religious facility by a state agency for a secular purpose does not necessarily violate the constitution.376 F. Supp. at 88.
In Dorner v. School District, 137 Wis. 147, 118 N.W. 353
(1908), the Wisconsin Supreme Court approved the maintenance of a public school in a parochial school building. A few years later, the court held that holding public school graduation exercises in a church did not violate article I, section 18 of the Wisconsin Constitution. Stare ex rel. Conway v. District Board,162 Wis. 482, 156 N.W. 477 (1916).
Further support for the opinion that such lease arrangements are constitutional may be found in discussions of the situation whereby a religious organization desires to lease space in a public building. My predecessor issued an opinion that the relationship of landlord and tenant which results from the use of state-owned facilities at a university campus by religious organizations would not result in "an excessive entanglement" between church and state. 63 OP. Att'y Gen. 374, 383 (1974).
BCL:JSM
[1] "Most of the nonpublic schools in Wisconsin are parochial schools. The stipulation of facts in State ex rel. Reynolds v.Nusbaum (1962), 17 Wis.2d 148, 151, 115 N.W.2d 761, was to effect there were 850 to 875 nonpublic schools in Wisconsin of which only 10 were not operated by any religious, church, or sectarian organizations." 63 Op. Att'y Gen. 473, 478 (1974).
[2] It should be noted that the phrase "religious societies, or religious or theological seminaries" has been construed to include primary and secondary nonpublic schools. State ex rel.Reynolds v. Nusbaum, 17 Wis.2d 148, 156, 115 N.W.2d 761 (1962). *Page 265